## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 08 2017, 10:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Timothy P. Broden
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jerod Lee Grenard,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 8, 2017

Court of Appeals Cause No. 79A02-1705-CR-1037

Appeal from the Tippecanoe Superior Court

The Honorable Randy J. Williams, Judge

Trial Court Cause No. 79D01-1611-F4-43

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Jerod Grenard (Grenard), appeals his aggregate thirteen-year sentence after he pled guilty to unlawful possession of a firearm by a serious violent felon, a Level 4 felony, Ind. Code § 35-47-4-5(c); criminal recklessness, a Level 6 felony, I.C. § 35-42-2-2(b)(1)(A); battery, a Class A misdemeanor, I.C. § 35-42-2-1(a)(1)(A); and possession of a Schedule IV controlled substance, a Level 6 felony, I.C. § 35-48-4-7(a)(b).

We affirm.

# ISSUE

Grenard presents a single issue on appeal, which we restate as: Whether Grenard's sentence is inappropriate in light of the nature of the offenses and his character.

# FACTS AND PROCEDURAL HISTORY

In 2016, Grenard was living in his parents' home in Tippecanoe County, Indiana. At the time, Grenard was dating Denise Shoemaker (Shoemaker), who had a criminal history and was moving into his parents' home to serve her house arrest. For his parents' home to be approved by Tippecanoe County Community Corrections for Shoemaker's house arrest, all firearms had to be removed. Accordingly, Grenard moved his Phoenix Arms .22 caliber handgun out of the house and stowed it in a safe, situated in his eighty-one-year-old grandmother's (Grandmother) garage.

[5] Grenard was unemployed and spent his days abusing drugs and alcohol. Grenard's family members were fearful of him due to his drug addiction and unchecked anger. For example, Grenard would direct his family members in doing certain things, and if they failed to comply, he would threaten them by stating that they would "pay for it." (Sentencing Tr. p. 58). On one occasion, Grenard broke his Grandmother's phone because it rang while she was helping him with something. There were also three separate incidents of Grenard going into his father's (Father) bedroom in the morning and beating Father while asleep.

[6] On October 4, 2016, Grenard spent his day drinking alcohol, smoking synthetic marijuana, and taking several nonprescribed Xanax pills. When Father arrived home from work and sat on the recliner, an intoxicated and high Grenard charged at Father. Grenard then hit and punched Father on the side of his head and face. Father sustained multiple injuries, including swelling on the left side of his head, redness to his left ear, and cuts on his forearm. Father eventually escaped from the altercation, and called the police. Around that time, Grandmother happened to call Father, and according to Grandmother, Father was "upset and crying" because Grenard's mother (Mother) "was in the house and [he] didn't know if [Grenard] was going to hurt her." (Sentencing Tr. p. 47). When Grandmother arrived, she encountered Mother who was in the bedroom, and Mother explained to Grandmother that Grenard had shoved her in the bedroom and ordered her to remain there. As Mother and Grandmother walked past Grenard's bedroom, Grenard exited holding "a club of some kind"

and he told Grandmother, "I'm going to kill you." (Sentencing Tr. p. 52).

Grandmother responded to Grenard's threat and stated, "[J]ust go ahead and kill me then." (Sentencing Tr. p. 52). At that moment, Grenard went into the kitchen and got a knife and put it against Grandmother's throat. Father was present and he succeeded in pulling Grenard away from Grandmother. Grenard continued to argue with Grandmother, and at some point, he "shoved" Grandmother and she fell backwards hitting her "arm on a roll top desk," causing multiple injuries on her arm. (Sentencing Tr. pp. 69, 47). Upon seeing Grandmother on the ground, Grenard threw the knife against the wall and put his arm around Grandmother to help her get up. Unaware that Father had already called the police, Grenard attempted to take Grandmother's phone to prevent her from contacting the police. Thereafter, in an enraged state, Grenard went outside and threw a chair toward a vehicle parked in the driveway and then threw the chair towards Father's work van, denting the driver's side door. When two officers with the Tippecanoe Police Department arrived on the scene, Grenard was still in a frenzy and he was making advances toward Father as if he was going to hit him. However, when Grenard saw the officers, Grenard's demeanor immediately changed to being more submissive and apologetic. The officers observed that Grenard had a strong odor of alcohol emanating from his mouth, and had blue residue on the inside of his nostrils which looked consistent with the snorting of crushed pills.

[7] After obtaining Father's consent, the officers searched Grenard's bedroom and they found numerous liquor and beer bottles, smoking devices and cut straws

for using drugs, a clear plastic bag containing several Alprazolam pills—classified as a Schedule IV controlled substance, a bag "containing what appeared to be synthetic marijuana, and two used blunts with spice." (Appellant's App. Conf. Vol. II, p. 51). Also, the officers located a Rubbermaid container with plant material which field-tested positive for 38.2 grams of marijuana.

[8] After Grenard's arrest, and apprehensive of what Grenard might have stored in the safe situated inside her garage, Grandmother contacted the police. The police thereafter obtained a warrant to search Grenard's safe. A subsequent search yielded a Phoenix Arms .22 caliber handgun, Grenard's birth certificate, a credit card application in Grenard's name, a coin collection, multiple watches, multiple zippo lighters, lock picking devices, knives, and jewelry.

[9] On November 2, 2016, the State filed an Information, charging Grenard with Count I, unlawful possession of a firearm by a serious violent felon, a Level 4 felony; Count II, criminal recklessness while armed with a deadly weapon, a Level 6 felony; Counts III-IV, battery, Class A misdemeanors; Count V, possession of marijuana, a Class B misdemeanor; Count VI, possession of a synthetic drug, a Class A misdemeanor; Count VII criminal mischief, a Class B misdemeanor; Count VIII, criminal mischief, a Class B misdemeanor; Count IX, possession of a Schedule IV controlled substance, a Level 6 felony; and Count X, possession of marijuana with a prior drug conviction, a Level 6 felony. On November 30, 2016, the State additionally charged Grenard with Count XI, invasion of privacy, a Class A misdemeanor.

[10] On March 16, 2017, pursuant to a plea agreement, Grenard agreed to plead guilty to Count I, unlawful possession of a firearm by a serious violent felon, a Level 4 felony; Count II, criminal recklessness while armed with a deadly weapon, a Level 6 felony; Count IV, battery, a Class A misdemeanor; Count IX, possession of a Schedule IV controlled substance, a Level 6 felony; and the State agreed to dismiss all other Counts. On April 13, 2017, after a factual basis was established, the trial court accepted Grenard's guilty plea, and dismissed all other offenses. That same day, the trial court conducted a sentencing hearing. At the close of the evidence, the trial court sentenced Grenard to consecutive terms of eight years for the Level 4 felony unlawful possession of a firearm by a serious violent felon, two years for the Level 6 felony criminal recklessness, and a suspended two-year sentence for the Level 6 felony possession of a Schedule IV controlled substance in the Department of Correction (DOC). For his Class A misdemeanor battery, the trial court ordered a suspended sentence of one year, fully executed in the Tippecanoe County Community Corrections to run consecutively. Grenard's aggregate sentence is thirteen years.

[11] Grenard now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

[12] Grenard claims that his thirteen-year aggregate sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) empowers us to independently review and revise sentences authorized by statute if, after due consideration, we find the trial court's decision inappropriate in light of the nature of the offense and the character of the

offender. *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007). The "nature of offense" compares the defendant's actions with the required showing to sustain a conviction under the charged offense, while the "character of the offender" permits a broader consideration of the defendant's character. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008); *Douglas v. State*, 878 N.E.2d 873, 881 (Ind. Ct. App. 2007). An appellant bears the burden of showing that both prongs of the inquiry favor a revision of his sentence. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case. *Cardwell*, 895 N.E.2d at 1224. Our court focuses on "the length of the aggregate sentence and how it is to be served." *Id.*

[13] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012*)*. For his Level 4 felony unlawful possession of a firearm by a serious violent felon, Grenard faced a sentencing range of two to twelve years, with the advisory sentence being six years. I.C. § 35-50-2-5.5. Grenard was sentenced to eight years. Secondly, for his Level 6 felonies—*i.e.*, criminal recklessness while armed with a deadly weapon and possession of a Schedule IV controlled substance, Grenard faced a sentencing range of six months to two and one-half years, with the advisory sentence being one year. I.C. § 35-50-2-7(b). The trial court imposed a two-year sentence for each felony offense, but suspended two years to probation. Lastly, Indiana Code section 35-50-3-2

provides that a person who commits a Class A misdemeanor shall be sentenced to not more than one year. Grenard was ordered to serve a suspended sentence of one year in community corrections for his Class A misdemeanor battery offense.

[14] With respect to the nature of his Level 4 felony unlawful possession of a firearm by a serious violent felon, Grenard states that he stored the handgun in a locked safe at Grandmother's house, which was approximately five miles away. The record shows that Grenard had been convicted of a Class A felony dealing in a narcotic drug in 2009. At his guilty plea hearing, Grenard admittedly stated that even though he stored the handgun at Grandmother's garage, he had the "ability to exercise dominion or control over" it. (Guilty Plea. Tr. p. 33). Grenard acknowledged that as a convicted felon, he was "aware" that he was not allowed to possess a firearm. (Guilty Plea. Tr. p. 33). During the sentencing phase, the State played in court a recorded phone call which Grenard had made to Grandmother while in jail. Grenard was heard trying to manipulate Grandmother to state that the Phoenix Arms .22 caliber handgun located in the safe was not his. Also, Grenard attempted to bribe Grandmother with $500, and he was heard pleading with her not to divulge to the police any information regarding the Phoenix Arms handgun. Grenard's phone call to Grandmother was in violation of a no-contact order. As for the nature of his Level 6 felony criminal recklessness while armed with a deadly weapon offense, eighty-one-year-old Grandmother went to Grenard's parents' home to try and calm down Grenard. Instead, Grenard threatened Grandmother that he was

going to kill her. Following Grenard's voiced threat, Grandmother taunted Grenard several times urging him to carry out his threat. In that moment, Grenard went into the kitchen, took a butcher knife, and then put it against Grandmother's throat. It was fortunate that Father was present and he successfully pulled Grenard away. If Father had not intervened, Grenard might have carried out his threat. On the nature of his Level 6 felony possession of a Schedule IV controlled substance offense, following a valid search of his bedroom, the officers found several Alprazolam pills, which are classified as Schedule IV controlled substances. Grenard possessed these pills without a valid prescription. Lastly, with regards to the nature of the Class A misdemeanor battery, Grenard hit and punched Father on the side of the head and face. Father sustained multiple injuries, including a swelling on the left side of his head, redness to his left ear, and cuts on his forearm.

[15] When considering the character of the offender, one relevant fact is the defendant's criminal history. *Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007). The significance of a criminal history in assessing a defendant's character varies based on the gravity, nature, and number of prior offenses in relation to the current offense. *Id*. While a record of arrests may not be used as evidence of criminal history, it can be "relevant to the trial court's assessment of the defendant's character in terms of the risk that he will commit another crime." *Cotto v. State*, 829 N.E.2d 520, 526 (Ind. 2005).

[16] Turning to the character of the offender, we do note several redeeming qualities. First, Grenard took responsibility for his conduct by pleading guilty.

Second, during the sentencing hearing, Grenard expressed genuine remorse, stating that he regrets his explosive behavior towards his family members. However, we must also acknowledge his criminal history. As a juvenile, Grenard had one adjudication for fighting. As an adult, in 2008, Grenard was arrested for conversion, which was resolved through a diversion agreement. Shortly thereafter, Grenard was convicted of a Class C misdemeanor minor consuming alcohol. In 2009, Grenard was convicted of a Class A felony dealing in a narcotic drug, and he was ordered to serve a lenient sentence of eight years in the DOC, with three years executed in community corrections, and the remaining four years were suspended to probation. In 2014, Grenard was arrested for a Class A misdemeanor possession of a synthetic drug, however, following a diversion agreement, that case was dismissed.

[17] In addition, Grenard's extensive substance abuse history is apparent that he has not otherwise led a law-abiding life. The record shows that between ages ten and twenty-two, Grenard smoked marijuana several times a month. At ages sixteen to about eighteen, Grenard experimented with hashish, cocaine, LSD, PCP, mushrooms, peyote, mescaline, Ecstasy, and Buprenorphine. Between age eighteen and twenty-one, Grenard's substance abuse progressed to daily use. Specifically, Grenard used opium/morphine, and Oxycontin several times a day. In the last four years before his present incarceration, Grenard's day-to-day drugs have been synthetic marijuana, valium, Xanax, and bath salts. At the time Grenard committed the instant offenses, he had consumed alcohol, smoked synthetic marijuana, and taken nonprescribed Xanax pills. The only

substance abuse treatment Grenard has ever received was after he was arrested in February 2009 for the Class A felony dealing in cocaine. During that time, Grenard participated in a drug abuse treatment from February 2009 to December 2009. Despite Grenard's successful ten months of drug treatment, he returned to his former drug habits, and he only stopped after he was incarcerated for his current offenses.

[18] Lastly, Grenard challenges his placement in the DOC and he posits that he would kick his drug habit if he was placed in community corrections or on probation. "A defendant challenging the placement of a sentence must convince us that the given placement is itself inappropriate. As a practical matter, trial courts know the feasibility of alternative placements in particular counties or communities." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (citation omitted). The record shows that in 2009, the trial court sentenced Grenard to a lenient eight years following his Class A felony dealing in cocaine conviction. A portion of Grenard's sentence was suspended to community correction, and he was placed on supervised probation. Grenard admits that he violated community corrections in 2009, but successfully completed his four-year supervised probation for a prior drug offense. Even though Grenard had responded well to probation in the past, he violated community corrections in the past, and isolation, it makes the sentencing alternatives unworkable. Moreover, the trial court in the instant case appears to have still exercised some leniency. For the Level 6 felony possession of a Schedule IV controlled substance, the trial court suspended Grenard's two-year

sentence to probation. For the Class A misdemeanor battery, the trial court ordered a suspended one-year sentence to community corrections.

[19] In light of the foregoing, we decline to find that Grenard's aggregate thirteen-year sentence is inappropriate in light of the nature of the offenses and his character.

## CONCLUSION

[20] In sum, we conclude that Grenard's sentence is appropriate in light of the nature of the offense and his character.

[21] Affirmed.

[22] Robb, J. and Pyle, J. concur